UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JAMAL SCOTT,                              :
                                         :
          Plaintiff                      :
                                         :
     v.                                  :  CIVIL NO. 3:CV-12-2041
                                         :
BILGAN ERDOGAN, *et al.*,                :  (Judge Kosik)
                                         :
          Defendants                     :

**<u>MEMORANDUM</u>**

This civil rights action, pursuant to 42 U.S.C. § 1983, was filed by Jamal Scott, an inmate currently confined at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"). He alleges violations under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Presently pending is a motion for summary judgment filed by remaining Defendants John Wetzel, Secretary of the Pennsylvania Department of Corrections ("DOC"), and Bilgan Erdogan, the Muslim Chaplin ("Imam") at SCI-Huntingdon. (Doc. 46.) For the reasons which follow, the motion will be granted in part and denied in part.

**I.     Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a

'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F.Supp.2d 1086, 1091 (M.D. Pa. 2011)(*quoting* Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)). The judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## II.    Statement of Undisputed Material Facts[1]

Except where expressly noted as disputed, the following facts of record are undisputed.

Plaintiff proceeds in this matter only with respect to the portions of the Original and Amended Complaints, Document Nos. 1 & 12, as they relate to his claim for First Amendment free exercise of religion requesting money damages against Defendants' in their

---

[1] In accordance with M.D. Pa. Local Rule 56.1, Defendants have submitted a statement of material facts in support of their summary judgment motion consisting of 139 paragraphs. (Doc. 51.)  Supporting evidentiary materials have also been submitted. (Doc. 53.)  Plaintiff is required to submit an opposing statement of facts responding to the numbered paragraphs set forth in Defendants' statement as to which he contends there is a genuine issue to be tried.  Plaintiff's opposing statement contains only 15 paragraphs. (Doc. 55.)  However, he also submits exhibits attached to his opposition brief . (Doc. 56.) As such, the facts set forth by Defendants will be admitted unless controverted by Plaintiff's evidentiary materials. *See* M.D. Pa. Local Rule 56.1.

individual capacities, and his RLUIPA claim requesting injunctive relief. (Doc. Nos. 42, 43.)

Plaintiff is an adherent of Orthodox Sunniyy Islam, and claims that Defendants are inhibiting

his ability to meaningfully practice his sincerely held "Orthodox Sunniyy Islamic" religious

beliefs. (Doc. 1, Compl. ¶ 1.) Defendant, John E. Wetzel, is the current Secretary of the

Pennsylvania Department of Corrections. He oversees the administration, management and

supervision of penal and correctional facilities programs and services within the DOC. (Doc.

53, Ex. C.) Defendant, Erdogan, has been employed at SCI-Huntingdon as the Muslim

Chaplin since approximately 2005. Prior to that time, he served as Muslim Chaplin at SCI-

Smithfield and SCI-Rockview, and volunteered at SCI-Muncy. (Doc. 53, Ex. A, Erdogan

Decl. ¶¶ 2, 3.) Erdogan holds a Master Degree in Social Sciences and has studied Religion

Psychology, Islamic History and Quranic Studies and Interpretations at Private Foundations.

(*Id.*, ¶ 4.) As Muslim Chaplain, he supports the religious needs of all inmates, but

specifically supervises the religious needs of Muslim inmates. (*Id.*, ¶ 5.) According to

Erdogan, he promotes the basic principles of Islam to all Muslim inmates without

concentrating on, influencing or showing any preference to any specific Muslim sect

activities. (*Id.*, ¶¶ 10, 11, 13, 14.) Plaintiff disputes Erdogan's qualifications to serve as the

Muslim Chaplin, citing to his "unofficial education, not with faculty" and because he does

not hold a degree or diploma in Islamic studies. (Doc. 56 at 37.) However, Erdogan has been

ordained as a Muslim chaplain by the Islamic Society of State College.

*Prayer*

Plaintiff claims that he has been denied various religious prayer rights including

prayers during daily Jama'ah (congregational prayer), Jumu'ah (Friday prayer services),

4

Eid'ul Fitri & Eid'ul Adha (feasting celebrations) and sunset prayers during Ramadan. (Doc. 1 ¶ 1(a).)

"Opportunities for religious activities are open to the entire inmate population, without regard to race, color, nationality, sexual orientation, or creed." (Doc. 53, Ex. B, DC-ADM 819, Section 1.A.1, P. 1-1.) "Religious services and programs [are] centralized for General Population status inmates. Participation or non-participation in religious programs is voluntary on the part of each inmate." (*Id.*, Section 1.A.3, p. 1-1.)

When Erdogan came to SCI-Huntingdon, he combined the Masjid Bilal Jiha, the Sunni community, and the Salafee Muslims into one Islamic community with one prayer service for all of them. Each group comes with their differences, but under the teaching of one Quran, one Prophet Muhammad. (*Id.* at 38-39.) It is impossible for the DOC to accommodate services for every school of Muslim thought, as they are numerous and time and space are limited within the institution. (Doc. 53, Erdogan Decl. ¶ 15; Klemm Decl. ¶ 11.) Islamic services (daily Jama'ah, Jumu'ah, Eid'ul Fitri & Eid'ul Adha, and sunset Jama'ah) are open for all Muslim inmates. (Erdogan Decl. ¶ 6.) SCI-Huntingdon does not provide sect-oriented services. The above services emphasize basic Muslim teachings and are available to all Muslims. (*Id.*, ¶ 7.)

Defendants maintain that Plaintiff's religious beliefs and practices are unique and not shared by the majority of the SCI-Huntingdon Muslim population. (*Id.* ¶ 19.) He desires separate services for himself, but the DOC cannot accommodate the individual religious preferences of each inmate. (*Id.* ¶ 21.) Plaintiff considers his doctrinal perspective to be the generally-held Muslim perspective, and he is treated no differently than any other Muslim at

the prison. (Erdogan Decl. ¶ 9.) He is not restricted from adhering to his personal doctrinal perspective, such as the direction of prayer, in the privacy of his cell. (*Id.* ¶ 22.)

Plaintiff disputes the above and claims that Erdogan has worked to funnel him to the Wahabiyy sect of the Muslim faith, and that the Wahhabi/Salafi services and teachings offered by Erdogan run contrary to the Sunni Islamic faith and practices. He further disputes that his religious position is "unique" at SCI-Huntingdon, and cites to at least nine (9) other Sunni Muslim inmates who share his beliefs and contest the Muslim services offered by the prison. (Doc. 56 at 44-45, Scott Decl. ¶ 29; 24-33, 41-45.) Moreover, SCI-Huntingdon provides services for the Jewish and the Jehovah's witness communities, which have approximately ten (10) members each. (Doc. 56 at 35, SCI-Huntingdon Facility Narrative Summary 2009-2010.)

*Denial of the Ability to Perform Rewardable Prayers*

Plaintiff alleges he is being denied the ability to perform rewardable prayers, specifically, the "use of prayer robe, prayer oil, head gear, foot gear, Siwak (mouth cleansing) branch for prayer, reciting the Quran, and ritual purification, consuming halal (Islamically permissible) foods." (Doc. 1, ¶ 1(b).) Defendants maintain that rewardable prayers are "optional", are performed by Muslim inmates during services and in their own cell, and are never prohibited by the DOC. (Doc. 53, Erdogan Decl. ¶¶ 23-27.) Plaintiff states that the rewardable prayers are based upon obligatory prayers fulfilled by doing certain acts.

The wearing of prayer robes is not mandatory in Islamic tradition, including orthodox. Prayer robes are restricted to being worn during ceremonial services by outside religious

leaders and are not available for purchase by inmates at the commissary. (*Id.* ¶ 28; Ex. D,

Mirarchi Decl. ¶ 10; Ex. B, DC-ADM 819, Section 3.A.1.t.1.b, p. 3-3.) Wearing of robes

creates a variety of security concerns including the ability to: create a hierarchical system

amongst the inmates; conceal weapons, contraband and impermissible food; be modified to

resemble civilian dress; frustrate the regimented inmate color-coded clothing system. (*Id.*

Mirarchi Decl. ¶ 13.)

The DOC permits the use of prayer oil during services. (Erdogan Decl. ¶ 29.) The

DOC restricts the use of oils, allowing practicing Muslims to apply a very small drop of

scented oil to their wrist prior to attending Jumu'ah. (*Id.* ¶ 8.) Inmates are permitted to use

oils during Juma'ah services. If Plaintiff attends the services, he may partake of the oils.

(Erdogan Decl. ¶ 30.) Distribution is closely monitored by the supervising Chaplain and no

inmates are permitted to be in possession of the bottles. (Mirarchi Decl. ¶ 9.) Inmate-

possessed oils present a security issue in that they have the potential to be flammable. Based

upon the number of inmates in each unit, a fire and safety issue is presented. (Mirarchi Decl.

¶ 5.) Another security concern is with respect to the use of oils on the wrists and/or ankles to

slip the cuffs and/or shackles, and the smell of oils to mask the scent of illegal substances.

(*Id.* ¶ 6.) Related sanitation issues also present a concern, and can affect offenders outside

the Muslim faith. (*Id.* ¶ 7.) Plaintiff disputes the security concerns cited by Defendants. He

claims that the prayer oil he seeks for purification is not flammable, and that other items sold

in the commissary have the potential to be flammable and/or could be utilized as slipping

and/or masking agents such as shampoos, conditioners, hair grease, after-shave and

petroleum jelly.

7

Inmates can order headgear (kufis) from the commissary that are either white or brown. These are the only colors available for purchase, as other colors could be affiliated with gangs. This applies to all religious headgear including the hijab, yarmukke, etc. (*Id.* ¶ 14.)

The footgear desired by Plaintiff refers to a type of leather sock. (*Id.* ¶ 19.) The DOC does not permit the sale of these items as they could easily be used as an implement of escape to climb over a protective fence. (*Id.*, ¶ 20.) Inmates are not permitted to possess leather gloves inside the prison for the same reason. The majority of Muslims in the DOC do not require footgear or accept socks for said purpose. The least restrictive means by which inmates may keep their feet clean for prayers is to wash their feet in the sinks of their cells; the DOC has been advised that leather socks are not necessary for inmates to conduct their prayers. (Erdogan Decl. ¶ 31; Mirarchi Decl. ¶ 22.) Wearing of footgear is not mandated by the religion. (Erdogan Decl. ¶ 32.) Plaintiff disputes the security concern advanced by Defendants with respect to leather footgear claiming that the commissary sells leather sneakers, shoes and items purchased by the Native Americans which could be used for the same purpose.

Siwaks are fibrous products used by some Muslims for hygiene, mainly for teeth cleaning. (Mirarchi Decl. ¶ 15.) Their use is not mandated by the religion. The prison has a significant concern with respect to keeping the Siwak sanitary in that the root is subject to humidity and must be soaked in rose water when it is dry. Inmates are not permitted to possess rose water. (*Id.* ¶ 16.) Inmates are provided with toothbrushes, and replacements when necessary, which serve as an adequate alternative. (*Id.* ¶¶ 17, 18; DC-ADM 815.)

8

All inmates are permitted to recite the Quran.  Defendant Erdogan has provided Plaintiff with a Quran, Arabic dictionary and Islamic literatures.  (Erdogan Decl. ¶¶ 34, 36.)

The DOC makes many accommodations for religious diets.  (Doc. 53 at 62, DC-ADM 819, Section 4(C).)  An inmate must be approved for a religious diet program.  (*Id.*, Ex. H, Religious Diet in the Department.)  Many Muslims prefer to maintain a *Halal* diet. (Doc. 53, Ex. F, Klemm Decl. ¶12.)  The least restrictive means for a Muslim inmate to maintain a *Halal* diet is to elect either the Alternative Protein option or to seek an accommodation for the No Animal Products Diet.  (*Id.* ¶ 14.)

In 2008, Plaintiff requested to pick and choose when he would receive a kosher diet. This request was refused because an inmate cannot choose which days he wishes to practice dietary religious practices.  (*Id.* ¶¶ 15, 16.)  Religious accommodations are made to accommodate sincerely held beliefs, and an inmate either adheres to a diet change or he does not.  Daily whims and preferences by inmates are impossible for the institution to accommodate.  (*Id.* ¶¶ 17, 18.)

*Ability to Perform Islamic Rites*

Plaintiff alleges that Defendants deny him the ability to fulfill Islamic Rites by "tak[ing] part in the two 'ids a year, tak[ing] part in the Mawlid (birthday) of Prophet Muhammad, classes from qualified orthodox Sunniy Muslim teachers, being able to fast on Mondays and Thursdays."  (Doc. 1, ¶ 1(c).)

The DOC accommodates special religious meals and provides special foods for major religious holy days.   (Klemm Decl. ¶ 19.; DC-ADM 819, Section 1.E., p1-7.)  Every celebration and holy day proclaimed to be a part of a religious belief is not fiscally or

logistically possible. (*Id.* ¶ 20.) The DOC provides *Halal* meats during feast times (Eid Fitri & Eid Adha) and Ramadan. (Erdogan Decl. ¶¶ 37, 63; *see also* DC-ADM 819.)

Any Muslim who fasted in Ramadan is eligible to and does receive DOC-provided foods for the *Eid al Fitr* ceremonial meal, celebrating the end of Ramadan. Inmates may also opt to pay for and order Optional Menu Items for this celebration. The Optional Menu Items are an additional accommodation beyond what the DOC provides to the inmate community. Erdogan Decl. ¶ 41; Klemm Decl. ¶ 21.) The payment is to ensure that necessary funds are available to purchase the Optional Menu Items. (Klemm, ¶22; DC-ADM 819, Section 1.E.1.h, p. 1-8.) Plaintiff has attended all of the *Eid* activities since at least 2005. (Erdogan Decl. ¶ 39.) When he was confined in the RHU, his feast meal was delivered to him. (*Id.* ¶ 40.)

Every inmate is permitted to designate and meet with a religious advisor. (DC-ADM 819, Section 1.H; Klemm Decl. ¶ 9.) Plaintiff's specific organization is very small and there is only one mosque in Pennsylvania that shares his views. (*Id.* ¶ 47.) He is in constant contact with the mosque in Philadelphia. (Erdogan Decl. ¶ 48.) Defendant Erdogan has called the Philadelphia Islamic Center multiple times to encourage a spiritual advisor to come to minister Plaintiff in his particular school of Muslim, but no one has volunteered to do so. (*Id.* ¶¶ 49, 50.)

It is not a practice in the majority of the Muslim world to celebrate the Mawlidul-Rasul (birthday of Prophet Muhammad). (*Id.* ¶ 46.) Monday and Thursday fasting is optional in the Muslim faith and believers can fast by themselves. (*Id.* ¶¶ 51, 52.) The DOC is unable to cater to each individual's evening-meal requests or preferred eating schedules in general.

(Erdogan Decl. ¶ 53; Klemm Decl. ¶18.)

*Ramadan*

Plaintiff contends that Defendants have denied him the ability to participate in Ramadan. Specifically, they have frustrated "[B]eginning Ramadan according to the rules of Islam and ending Ramadan in the same manner, praying the sunset prayer in congregation prior to eating the meal, having Ramadan meals chosen, prepared, blessed and served by Muslims, having *Sahur* meals that are hot and comparable to the general population meals rather than cold cereal for 30 days, breaking the fast with dates each day of the fast." (Doc. 1, ¶ 1(d).)

The DOC accommodates the needs of the Muslim population during the Ramadan fast and prepares its policy, procedures and menu selections pursuant to the advise of Muslim religious counsel. (Erdogan Decl. ¶ 54; Klemm, ¶ 23.) The Memorandum of Understanding distributed by the DOC to all institutions in 2012 was meant to inform each inmate as to the accommodation of Ramadan, and the inmates were asked to sign to indicate their understanding. (Doc. 53, Erdogan Decl. ¶¶ 42, 43; Klemm Decl. ¶¶ 25, 26; Ex. G, Memorandum of Understanding.) The DOC no longer releases such memorandums and Muslim inmates are currently provided with a copy of its "Ramadan Fasting Procedures"for their informational purposes only. (Klemm Decl. ¶ 29; Ex. I, Ramadan Fasting Procedures.)

The DOC adheres to the Islamic Society of North America's ("ISNA") ruling, as is the common practice in Islam; Muslim inmates follow the rule of the local authority where they reside for the commencement and termination of Ramadan. (Erdogan Decl. ¶ 55.) The majority of the Muslims in North America follow the announcement and ruling by ISNA. (*Id.*

¶ 56.)

The DOC permits the Muslim population one congregational prayer each day of the Ramadan month. (*Id.* ¶ 57.) Due to time limitations, the Muslim congregation at SCI-Huntingdon prays each day of Ramadan in the chapel from 1 p.m. to 2 p.m. in observance of the sunset prayer in *Jama'ah* (congregational) prior to eating Ramadan meal. (*Id.* ¶ 58.) According to Islam, it is not mandatory to pray only during sunset time and believers can pray the sunset prayer in their cells individually. (*Id.* ¶ 59.) The DOC permits Muslim kitchen workers to prepare and serve the food during Ramadan. (*Id.* ¶ 60.) According to the Quran there is no harm in eating food prepared or meat slaughtered by the people of the Book (Christians & Jews). (*Id.* ¶ 38.)

With respect to *Sahur* meals (breakfast meal), the practice of the Prophet Muhammad was only eating three dates and cold water during *Sahur* meal. It is not mandatory to eat a hot meal during *Sahur*. (*Id.* ¶ 61.) In Islamic tradition, breaking the fast can either be with dates, raisins or water. It is not mandatory to break fasting with dates. (*Id.* ¶ 62.) Muslim communities may purchase dates for fast breaking as one of their Optional Menu Items during Ramadan. (Klemm Decl. ¶ 30.)

The DOC does not provide a similar dried fruit, but donated government commodities may be used if available (*e.g.*, raisins, cranberries, etc.) (*Id.* ¶ 31.) If the entire Muslim community does not purchase dates, and if government commodities are not available, participating inmates may break their fast with water. (*Id.* ¶ 32.) Funds donated and designated for the purchase of dates by an outside source are acceptable, provided the donation of funds is approved by the Facility Manager and provided Food Services is able to

secure the dates. (*Id.* ¶ 33.)

The *Sahur* bag is prepared according to the approved Ramadan menu. (*Id.* ¶ 34.) If the Muslim community has purchased/secured dates for the breaking of the fast or donated fruit is available, the institutions may opt to insert dates or available government commodity dried fruit into the *Sahur* bags for consumption by inmates in their cells prior to sunset the following day. (*Id.* ¶ 35.)

On the day of the *Eid al-Fitr* Meal, one meal on the mainline menu (either lunch or supper) is altered to served foods appropriate and approved for the feast. (*Id.* ¶ 36; DC-ADM 819, Section 1.E.1.f, p. 1-8.) The Muslim Chaplin(s) and Religious advisors in conversation with the Muslim communities determine if the community wishes to purchase Optional Menu Items for the *Eid al-Fitr* Meal. Inmates may not elect optional menu items individually. (Klemm Decl. ¶ 37; DC-ADM 819, Section 1.E.1.g., p. 1-8.) If the community elects to purchase Optional Menu Items, each inmate pays the same amount. (*Id.* ¶ 38.) Plaintiff is a regular participant in these meals. (Erdogan Decl. ¶ 63.) If no Optional Menu Items are purchased, there is no cost for approved inmates to participate in the *Eid al-Fitr* Meal, and the mainline meal is served to the Muslim community at a separate time determined by Security and Food Services. Inmates who do not pay for Optional Menu Items go to the regular mainline and receive DOC-supplied foods as their *Eid al-Fitr* Meal. (Klemm Decl. ¶¶ 39, 40.)

*Access to Resources*

Plaintiff contends that Defendants have denied him a means to gain knowledge of his faith. (Doc. 1, ¶ 1(e).) Plaintiff is permitted to use, and has used, the Muslim Library. He

has also borrowed Islamic audiotapes. (Erdogan Decl. ¶¶ 64, 65.) Defendant Erdogan has attempted to accommodate any requests by Plaintiff for religious materials related to his particular school of thought, but Plaintiff is dissatisfied with the available texts and has rejected Erdogan's offerings of literature, refused literature written in English, and demanded downloaded material from the Internet.. (*Id.* ¶ 35; *see also* Doc. 53, Ex. J-2 Grievance Packet 300417.) Plaintiff claims that many of the materials offered reflect the views of the Wahabism/Salafiyy sect. (*Id.*, Ex. J-2 at 153-154.) Erdogan requested Plaintiff to compile a list of 6-7 people of his school of Muslim thought in order that special services or classes might be arranged for them using tapes or videos. (Erdogan Decl. ¶ 67.) According to Defendants, Plaintiff could not find anyone who shares his same school of thought. (*Id.* ¶ 68.) Plaintiff states that there are at least nine (9) other inmates at SCI-Huntingdon, in addition to himself, who share in his same beliefs. (Doc. 56 at 24-33, Harper, Dozzo, Brown, Allan, Gregory, Allen, Austin, Manning and Ibn-Sadiika Decls.)

## III.   Discussion

### A.   Defendant Wetzel

Without unnecessary elaboration, summary judgment is warranted in favor of Defendant, Wetzel, on all claims. The undisputed record is void of any evidence that Wetzel was personally involved in the conduct alleged by Plaintiff, or that he had actual knowledge of, or acquiesced in, the commission of the alleged wrongs. *See Rizzo v. Goode*, 423 U.S. 362 (1976); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). *Respondeat superior* may not be used to impose liability against Wetzel in his position as the Secretary of the Department of Corrections. Plaintiff admits that Wetzel is named as a defendant due to his

approval of overall DOC policy in his supervisory capacity. He has come forth with no

evidence demonstrating involvement by Wetzel in the specific conduct alleged.

**B.    First Amendment Exercise of Religion**

The First Amendment to the United States Constitution is made applicable to the

states by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It

provides, *inter alia*, that "Congress shall make no law respecting an establishment of

religion, or prohibiting the free exercise thereof ... " U.S. Const. amend. I. The protection for

expressive activities offered by the First Amendment is lessened, but not extinguished, in the

prison context, where legitimate penological interests must be considered in assessing the

constitutionality of official conduct. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Although

prisoners must be afforded "reasonable opportunities" to exercise the religious freedoms

guaranteed by the First Amendment, *see Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972),

imprisonment necessarily results in restrictions on some constitutional rights, including the

First Amendment right to the free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342,

348-49 (1987). Only beliefs which are both sincerely held and religious in nature are entitled

to constitutional protection. *Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972); *Dehart v.

Horn*, 227 F.3d 47, 51 (3d Cir. 2000). The law is also clear that a religious practice is

protected even if it is not deemed to be mandatory or practiced by every member of the

religion. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16

(1981)("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of

the members of a religious sect."); *DeHart*, 227 F.3d at 56 ("It would be inconsistent with a

long line of Supreme Court precedent to accord less respect to a sincerely held religious

belief solely because it is not held by others.").

Defendant does not dispute the sinceirity of Plaintiff's religious beliefs. The question before the court is whether Defendant's practices violate Plaintiff's right to freely exercise those beliefs when applying the Supreme Court's "reasonableness test." *See Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 349. The test examines four factors: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forth to justify it; (2) whether there are alternative means of exercising First Amendment rights that remain open to the prisoner; (3) the impact that an accommodation of the asserted right will have on guards, other prisoners, and the allocation of prison resources generally; and (4) whether there are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. *Id.* at 89-91.

The test's objective "is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protect activity." *De Hart*, 227 F.3d at 59. However, prison officials are not required to choose the least restrictive means possible in trying to further penological interests, *Thornburgh*, 490 U.S. at 411, and the burden is on the prisoner to disprove the validity of the regulation or practice. *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) *citing Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). While the ultimate burden of persuasion rests with the prisoner, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid penological interest. *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009). "Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement." *Wolf v. Ashcroft*, 297 F.3d

305, 308 (3d Cir. 2002)(*quoting Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir. 1999)).  If

the government meets its burden, the court considers the other three *Turner* factors, and

analysis of those factors is generally "fact-intensive."  *Wolf*, 297 F.3d at 310.

      1.    Prayer services

      The "opportunity to worship as a congregation by a substantial number of prisoners

may be a basic religious experience and, therefore, a fundamental exercise of religion by a

bona fide religious group." *Sharp v. Johnson*, 669 F.3d 144, 160 (3d Cir. 2012)(quoting

*Small v. Lehman*, 98 F.3d 762, 768 (3d Cir. 1996), *overruled in part on other grounds by*

*City of Boerne v. Flores*, 521 U.S. 507 (1997)).  But not "every religious sect or group within

a prison–however few in number–must have identical facilities or personnel." *Cruz v. Beto*,

405 U.S. 319, 322 n.2 (1972).  And "[a] special chapel or place of worship need not be

provided for every faith regardless of size, nor must a chaplain, priest, or minister be

provided without regard to the extent of the demand." *Id.*  The First Amendment does not

require the state to furnish separate religious services for "a single prisoner or a non-

substantial number of like-minded prisoners." *Sharp*, 669 F.3d at 160,

      On the record currently before the court, genuine issues of material fact exist as to

whether the policy at SCI-Huntingdon with respect to prayer services burdens Plaintiff's

right to freely exercise his religion.  There is evidence in the record that communal prayer is

an essential element of Plaintiff's religious beliefs, and that significant doctrinal differences

exist between his sect and the teachings/practices in the only communal Muslim services

being offered at SCI-Huntingdon.  While Defendant claims it is only Plaintiff that follows a

unique religious point of view and that the prison cannot accommodate personal services just

17

for him due to budgetary, staff and security concerns, Plaintiff has come forward with

evidence that there are at least nine other followers of his faith, and that other religious

groups comparable in size are accommodated by the prison. With these critical facts in

dispute, the court cannot determine on a motion for summary judgment whether Plaintiff's

First Amendment rights have been burdened.

        2.     Rewardable Prayers/Sacred Objects

Although Defendant asserts that many of the practices cited by Plaintiff are not

mandatory in Islamic tradition, including orthodox, a religious practice is protected even if it

is not deemed to be mandatory or practiced by every member of the religion. *See Thomas*,

450 U.S. at 715-16; *Daley v. Lappin*, 555 F. App'x 161, 164-65 (3d Cir. 2014)(non-

precedential). Regardless, in the instant case a valid rational connection exists between the

denial or limited availability of the challenged items and the legitimate security, sanitation

and fiscal interests put forth to justify the denials/limitations. Moreover, the restrictions

imposed apply across-the-board to all inmates, and are not religious-based. Such restrictions

have consistently been found to be appropriate under *Turner*.

Plaintiff contests the security justifications advanced in support of the restrictions

applicable to prayer oil and footwear. He argues that items with similar properties, *i.e.*,

slippery, scented, made of leather, are sold in the commissary. The court affords no weight

to this argument in that the record does not contain evidence documenting what items are

sold in the commissary and the properties of any such items as compared to the restricted

items. *See Banks v. Beard*, No. 3:CV-10-1480, 2013 WL 5465165, *11 (M.D. Pa. Sept. 30,

2013.)

While purification may be central to Plaintiff's religious beliefs, he is able to utilize a toothbrush and socks in place of the leather sock and siwak, and wear headgear consistent with the colors permitted by the DOC.[2] In addition, alternative means remain open for Plaintiff to practice his religious beliefs. He is able to read the Quran and Islamic literatures, conduct individual prayer in his cell, maintain a religious diet by electing either the Alternative Protein option or seeking an accommodation for the No Animal Products Diet, participate in religious feasts and fasting, and maintain contact with the mosque in Philadelphia. The undisputed evidence reveals that Plaintiff does possess some religious material pertinent to his faith and has the ability to seek an accommodation for a religious diet consistent with his beliefs. His previous requests were rejected only on the basis that he wished to elect the days he received the accommodation, as opposed to committing to a specific religious diet creating a burden on the Food Services Department and failing to reveal a sincere commitment to a particular religious diet. Based on the foregoing, the third and fourth *Turner* factors clearly weigh in favor of Defendant. The costs imposed on other inmates, guards and prison resources in accommodating Plaintiff with respect to the foregoing challenges is evident, and no alternatives exist that fully accommodate his rights at a *de minimis* cost to valid penological interests that are not already available to him. Accordingly, summary judgment is warranted in favor of Defendant on these claims.

---

[2] Plaintiff argues that there is no alternative to his use of prayer oil in that the only other option other than possessing it in his cell is to attend the service where it is permitted, but attendance of the service violates his religious beliefs. While the court has found a triable issue of fact with respect to the services offered, this does not prevent the entry of summary judgment with respect to prayer oil in that other available avenues exist for Plaintiff to practice rewardable prayers.

3.     Ability to Perform Islamic Rituals

The Islamic rituals Plaintiff claims he is unable to perform are taking part in the two "Ids"[3] a year, Mawlid (birthday) of Prophet Muhammad, classes from qualified orthodox Sunniyy Muslim teachers, and fasting on Mondays and Thursdays. The undisputed evidence in the record reveals that Plaintiff has attended and participated in both "Id" celebrations each year since at least 2005, and when Plaintiff was confined in the RHU, his feast was delivered to him. Plaintiff fails to rebut this evidence. In addition, there is nothing which prevents Plaintiff from fasting on Mondays and Thursdays on his own. With regard to classes from qualified orthodox Sunniyy Muslim teachers, the undisputed record demonstrates that Plaintiff is free to designate and meet with religious advisors and that Defendant contacted the only mosque in Pennsylvania that shares his views to encourage a spiritual advisor to come to SCI-Huntingdon to counsel Plaintiff. No one at the mosque has agreed or volunteered to do so. Defendant also offered to arrange special classes using tapes or videos if Plaintiff provided him with a list of 6-7 people sharing his religious beliefs, but Plaintiff failed to do so. While in opposing the pending summary judgment motion he now comes forward with declarations from nine other inmates who share his religious beliefs, he fails to rebut Defendant's evidence that he ever informed Defendant about these individuals prior to this time.

DC-ADM 819, Section 1(E) addresses the issue of special food services with respect to religious holidays. Pursuant to said section, special foods may be provided as required for

---

[3] The "Id" celebrations refers to two of the major Muslim feasts - Eid Fitri and Eid Adha.

the major religious holy days consistent with established DOC policy. (Doc. 53 at 21.) Each year, the DOC provides the Muslims Halal meats during feast times (*Eid Fitri & Eid Adha*) and Ramadan. (Doc. 56 at 35.) There is no dispute that SCI-Huntingdon does not formally observe Mawlid, the birthday of Prophet Muhammad. Plaintiff maintains that celebrating Mawlid is part of his religious belief, which includes fasting that day while studying Muhammad's life, and thereafter ending with a Halal celebratory meal. Defendant submits evidence establishing that the DOC cannot fiscally or logistically accommodate all celebrations and religious holy days that inmates proclaim to be part of their religious beliefs. Moreover, there is no evidence in the record establishing that Mawlid is considered to be one of the major celebrations in Plaintiff's faith. Defendant presents a legitimate, rational connection between the prison's policy with respect to religious celebrations and the interest in maintaining institutional order in light of the impact that accommodating all religious celebrations would have on staff and finances.

As previously discussed above, Plaintiff has alternative means of exercising his religious beliefs including individual prayer, fasting, maintaining a religious diet, participating in approved religious celebrations, maintaining contact with the mosque in Philadelphia, and reading the Quran. Accommodating the Mawlid celebratory meal annually for the small number of inmates sharing in this belief may not seem to impose a significant cost on inmates, guards and prison resources generally. However, the ripple effect of being required to recognize any and all professed "important" dates for all religions would have a staggering effect on prison operations in light of the evidence offered by Defendant with respect to the work involved in accommodating special religious meals.

21

4.   Ramadan

Plaintiff argues that Defendant has interfered with his right to practice his religious beliefs with regard to observing Ramadan with respect to (1) the dates Ramadan begins and ends; (2) praying at sunset in congregation prior to eating the evening meal; (3) having Ramadan meals prepared and served by Muslims; (4) receiving *Sahur* (breakfast) meals that are not hot, *i.e.*, cold cereal; and (5) not being provided dates each day to break the fast.

The undisputed record establishes that the DOC readily accommodates the needs of the Muslim population during the Ramadan fast and prepares its policy, procedures and menu after consultation and advice from Muslim Religious Advisors. The DOC adheres to the Islamic Society of North America's (ISNA) rulings with respect to Ramadan, as is the common practice in Islam, and where the rule of local authority is followed for the commencement and termination of Ramadan. Plaintiff offers no evidence to rebut that Defendant has any involvement in scheduling when Ramadan begins and ends, or that the established times being followed by the prison (1) are not in accordance with ISNA or (2) the ISNA dates are not in accordance with his religious beliefs. Plaintiff also fails to rebut Defendant's evidence that a hot *Sahur* meal is not required, that dates are not required to break the fast in that water can also be used, and that Muslims are preparing and serving the Ramadan meals.

With respect to congregational prayer, the undisputed evidence reveals that one congregational prayer is offered each day of the Ramadan month. Plaintiff takes issue with the time of day the congregational prayer is conducted in that it is prior to sunset and before the evening meal. The DOC states that due to time limitations, the daily Ramadan

22

congregational prayer occurs from 1 p.m. to 2 p.m. in observance of the sunset prayer prior to eating the Ramadan meal. While believers are not mandated to pray only during sunset time, they are free to do so in their cells individually.

In applying *Turner* to Plaintiff's Ramadan challenges, the evaluation of penological objectives is "committed to the considered judgment of prison administrators," and the court must accord great deference to prison officials' adoption and execution of policies, regulations and practices relating to the preservation of internal order, discipline and security within the prison environment. *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989). As such, we find that a valid, rational connection exists between the scheduling of when the daily congregational prayer and evening meal takes place and the prison's interest in the orderly operation/security of the prison.

In addition, Plaintiff has other avenues of religious expression available. He is able to pray the sunset prayer individually in his cell, observe the fasts, break his fast with water, purchase dates as a Muslim community as one of the Optional Menu Items during Ramadan[4], read the Quran and other religious materials, contact the mosque in Philadelphia, and participate in the major religious feasts. As such, the second *Turner* factor weighs in favor

---

[4] The DOC does not offer dates or any other similar dried fruits. However, pursuant to DC-ADM 819, a religious community of inmates may share the costs of purchasing food for feasts as set forth in Defendant's evidentiary materials. The requirement of having inmates purchase the desired food has been found to pass constitutional muster in that it serves the legitimate penological purpose of cost containment, since the food offered at the particular religious feast or observance is not normally offered for regular meals and the First Amendment "does not require the government to subsidize" the exercise of religious rights. *See generally Peele v. Klemm*, No. 13-200, 2014 WL 4828870, *3 (W.D. Pa. Sept. 29, 2014); *Banks v. Beard*, 2013 WL 5465165 (M.D. Pa. 2013). The court finds these cases to be persuasive.

of Defendant.  With respect to the third and fourth *Turner* factors, the undisputed evidence

demonstrates the consequences accommodating Plaintiff's requests would have on the

guards, other inmates and the allocation of prison resources.  For these reasons, Defendant's

motion for summary judgment will be granted with respect to the Ramadan claims.

>   5.   Access to resources

Plaintiff generally contends that Defendant is denying him a means to gain

knowledge of his faith.  The undisputed record paints a different picture. The evidence of

record reveals that Defendant has offered and attempted to accommodate Plaintiff's religious

beliefs with respect to accessing information/materials particular to his school of Muslim

thought.  Plaintiff has been afforded access to and utilized the Muslim library, and has

borrowed Islamic tapes.  While he may reject certain literature provided by Defendant

because he would prefer downloaded information from the Internet, this does not establish an

unreasonable restriction of his First Amendment right.

Pursuant to DC-ADM 819, section 1.H, every inmate is permitted to designate and

meet with a religious advisor.  Plaintiff has been in constant contact with the Philadelphia

mosque.  Defendant has called the Philadelphia Islamic Center multiple times to encourage a

spiritual advisor to come to SCI-Huntingdon to minister Plaintiff, but no one has volunteered

to do so.

Plaintiff further admits that he was present on one occasion in Defendant's office

when Defendant called to request that a CD and literature be sent to the prison with respect to

Plaintiff's religious beliefs.  There is no evidence in the record supporting Plaintiff's claim

that these materials were ever received by Defendant and withheld from him.  Moreover, in

response to a letter Plaintiff wrote to the Association of Islamic Charitable Projects requesting information, he was informed that when CDs had been sent to the Chaplain, they were informed that inmates were not allowed CDs in their individual cells. Plaintiff was advised to listen to the CDs together in a class setting with others, take notes and review them together, and then to review the notes thereafter in order to properly obtain knowledge. (Doc. 56 at 40.)

The unrebutted evidence reveals that Defendant has informed Plaintiff that if he provides him with a list of 6-7 names of fellow believers in his school of thought, that he would arrange special services/classes using tapes and videos. Plaintiff has failed to offer evidence that he ever provided Defendant with such information. Although now in opposing summary judgment Plaintiff comes forward with declarations from nine other inmates who share his beliefs, there is no evidence that he ever provided these names to Defendant, and that Defendant thereafter refused to organize a small group setting.

Based on the foregoing, any First Amendment challenge fails under *Turner*. There is no evidence showing that Defendant burdened the practice of Plaintiff's religion through any policy or by any conduct thereby preventing him accessing knowledge with respect to his particular beliefs. Summary judgment will be granted with respect to this claim.

### C. RLUIPA claims

RLUIPA provides, in pertinent part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government demonstrates that the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA

defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also Cutter v. Wilkinson,* 544 U.S. 709, 715 (2005).

Initially, an inmate must establish that he possesses a sincerely held, authentic religious belief, the exercise of which the government has substantially burdened, even if the burden results from a rule of general applicability. *See Cutter*, 544 U.S. at 725, n. 13; *Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007). Substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id*. at 280.

Once an inmate proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government. At this point, the court must determine whether the government has demonstrated that the burden was imposed in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest. *See Washington*, 497 F.3d at 282.

In making this determination, the court is mindful that " 'context matters' ", *Cutter*, 544 U.S. at 723 (*quoting Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)), and gives " 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id*. (*quoting* S.Rep.No. 103-

26

111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900.)

In the instant case, Defendant does not dispute that Plaintiff possesses a sincerely held, authentic religious belief in practicing his Orthodox Sunniyy Islamic faith. Based on the record before the court, questions of fact exist with respect to the prayer services available to Plaintiff. A jury could conclude that Plaintiff is faced with the option of attending services that are contrary to the teachings and practices of his beliefs or forfeiting a benefit made available to other inmates. A jury could conclude that Defendant is placing substantial pressure on Plaintiff to modify his behavior/violate his beliefs. If a substantial burden is found to exist, and recognizing the government's compelling interest in limiting the number of services offered for each of the different religions at the prison, questions of fact remain with respect to whether the least restrictive means are being implemented in this case to further that interest. As such, summary judgment will be denied on this issue.

With respect to the rewardable prayers/sacred objects claim, the undisputed facts fail to demonstrate that any substantial burden is being placed on Plaintiff's ability to exercise his particular beliefs. While he may not be permitted to wear a robe, leather socks, or choose the color of his headgear, he is not forfeiting benefits generally available to others or abandoning any precept of his faith in order to receive a benefit. He is able to engage in individual prayer in his cell, observe purification requirements of his faith by wearing socks on his feet and through the use of a toothbrush, and is able to request any necessary accommodation for religious meals providing he commits to a particular diet plan. Even if Plaintiff were able to establish a substantial burden, Defendant has clearly demonstrated a compelling interest in maintaining prison security/orderly running of the prison, and the record evidence reveals

27

that the policies imposed are the least restrictive means of furthering that interest. Accordingly, summary judgment will be granted in favor of Defendant on this issue.

The same is true with respect to Plaintiff's ability to fulfill Islamic rites and learn Islam. The undisputed evidence shows that he does take part in the two Id feasts each year and is able to individually fast on Mondays and Thursdays. While he claims that he is being substantially burdened because he is not permitted to celebrate Mawlid, participate in classes from a qualified Sunniyy Muslim teacher or access Islamic knowledge, the record fails to support his position.

With respect to Mawlid, he is able to offer individual prayer in his cell and fast in observance of the Prophet Muhammad's birthday. While the prison does not accommodate a special celebratory meal on this date, even if this could be considered to be a burden, it is not a "substantial burden" requiring him to substantially modify his religious beliefs. Moreover, the unrebutted evidence reveals that a compelling governmental interest exists in only recognizing and preparing special celebratory meals for the major holidays/holy days for each religion and that the policy in place is the least restrictive means for doing so. Plaintiff offers no evidence establishing that Mawlid is, in fact, a major celebration in his particular faith.

With respect to Sunniyy classes/gaining knowledge, the record reveals that Defendant has offered to organize classes if Plaintiff provides him with the names of 6-7 individuals at the prison who share his beliefs. There is no evidence that he has ever done so. In addition, it is undisputed that Defendant has made attempts to obtain written materials for Plaintiff and to seek qualified volunteers to come to the prison to counsel him. Further, Plaintiff has a

Quran and uses the Muslim library. As such, a jury would not be able to conclude that a substantial burden was placed on Plaintiff by Defendant with respect to his ability to perform Islamic rites/obtain knowledge about his faith.

The court next examines Plaintiff's RLUIPA challenges with respect to Ramadan. The record evidence would not enable a jury to conclude that Plaintiff's right to freely exercise his religion has been burdened substantially with respect to the beginning/ending times of Ramadan, the service of a cold versus hot *Sahur* breakfast meal, or having Muslims prepare and serve the Ramadan meals. First, there is no evidence in the record that Defendant has anything to do with when Ramadan begins and ends. Rather, the evidence demonstrates that the DOC adheres to the rulings of the ISNA. Further, the unrebutted evidence demonstrates that the meals are prepared and served during Ramadan by Muslims, and that a hot *Sahur* meal or dates for breaking fast are not required. While Plaintiff may prefer hot breakfast meals and dates to break fast, his religious beliefs are not being substantially burdened in that he has other ways of expressing and practicing his faith, and is not being forced to violate any precept. He has failed to come forth with any evidence rebutting Defendant's evidence that he can consume cold *Sahur* meals, and break his fast with water, if dates are not either donated to the prison or purchased as an Optional Menu Item.

However, a genuine issue of material fact exists as to whether Plaintiff's religious beliefs have been substantially burdened by his inability during Ramadan to pray at sunset in congregation prior to eating the evening meal. While the "Ramadan Fasting Procedures" suggest that communal evening prayers and evening meals may be part of the acceptable

29

events during the Ramadan observance, this is not the practice being followed at SCI-Huntingdon. (Doc. 53 at 120, "Ramadan Fasting Procedures".) A jury question exists with respect to whether the government is putting substantial pressure on Plaintiff to substantially modify his behavior and to violate his religious beliefs. Moreover, a jury could also conclude that less restrictive means exist for accomplishing the government's objective of "time limitations" (Doc. 51, SMF ¶113) and the orderly operation of the prison. For these reasons, this RLUIPA claim will also proceed to trial.

## IV. Conclusion

Based on the foregoing, Defendants' motion for summary judgment (Doc. 46) will be granted in part and denied in part as set forth above.

An appropriate order will issue.