UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JAMAL SCOTT,

        Plaintiff

v.

BILGAN ERDOGAN,

        Defendant.

CIVIL ACTION NO. 3:12-CV-2041

(MEHALCHICK, M.J.)

## MEMORANDUM

This is a civil rights action in which Plaintiff Jamal Scott, a state prisoner currently housed at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"), alleges that various Pennsylvania Department of Corrections ("DOC") Defendants have inhibited Scott's ability to meaningfully practice his religion in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (Doc. 12). Following dispositive motions, the Court granted partial summary judgment and directed that judgment be entered in favor of Defendant DOC Secretary John Wetzel on all claims, and in favor of Defendant Bilgan Erdogan, the Muslim chaplain ("Imam") at SCI-Huntingdon, on all claims *except* for Scott's prayer services claim and Ramadan claim regarding prayer at sunset in congregation prior to eating the evening meal.[1] (Doc. 59; Doc. 60). Now pending before this Court is a motion to bifurcate, in which Erdogan asserts an affirmative defense that Scott has failed to exhaust administrative remedies in regard to his remaining claims. (Doc. 84).

---

[1] The parties dispute whether Wetzel has been dismissed from these proceedings entirely or remains as a Defendant in his official capacity in regard to the RLUIPA claim. (Doc. 88, at 4-7; Doc. 89, at 3-4).

I. BACKGROUND AND PROCEDURAL HISTORY

Erdogan filed the instant motion for bifurcation (Doc. 84), along with a brief in support thereof (Doc. 85), on November 16, 2015. *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."). Scott, through counsel, filed a brief in opposition on November 20, 2015, "agree[ing] that the issue of exhaustion should be decided in advance of the trial" but requesting an opportunity to conduct discovery before this determination. (Doc. 88, at 8). On December 29, 2015, the Court issued an Order finding that the exhaustion dispute should be resolved separately prior to trial, and to that end: (1) scheduled an evidentiary hearing and oral argument for February of 2016; (2) directed the parties to exchange any discovery materials related to the issue of exhaustion; and (3) directed the parties to submit proposed findings of fact and conclusions of law. (Doc. 91). The hearing and oral argument took place on February 11, 2016, and the parties submitted final post-hearing briefs on March 17, 2016. (Doc. 99; Doc. 100). Accordingly, the issue of administrative exhaustion is now ripe for disposition.

II. DISCUSSION

A. THE ADMINISTRATIVE EXHAUSTION REQUIREMENT

Under the Prison Litigation Reform Act of 1996 (the PLRA), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 206 F.3d 289, 291 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001). The exhaustion requirement is mandatory, and may not be excused on the grounds that exhaustion would be futile. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. 731, 741 (holding that the exhaustion requirement of the PLRA applies "regardless of the relief offered

- 2 -

through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000) ("[W]e are of the opinion that § 1997e(a), as amended by the PLRA, completely precludes a futility exception to its mandatory exhaustion requirement."). Moreover, in order to exhaust remedies, a plaintiff must pursue a grievance through final administrative review. *Salley v. PA Dept. of Corr.*, 181 F. App'x 258, 264 (not precedential) (3d Cir. 2006). Inmates who fail to fully exhaust administrative remedies may not subsequently litigate those claims in federal court. *Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 2000).

The exhaustion of administrative remedies must also be "proper." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 93. Ordinarily, Pennsylvania inmates must exhaust administrative remedies in accordance with a three-tiered grievance system established by the DOC, DC-ADM 804.[2] *See Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004). Inmates must file an initial grievance within fifteen working days of the incident for review by the facility grievance coordinator or a staff member designated as a grievance officer. (Doc. 99, at 4, 8); DC-ADM 804 § VI.A.8 (effective Jan. 3, 2005). If the inmate is dissatisfied with the initial review response, that inmate may appeal to the facility manager. (Doc. 99, at 5); DC-ADM 804 § VI.C (effective Jan. 3, 2005). Finally, if the inmate remains dissatisfied after receiving the facility manager's response, the inmate may file an

---

[2] DC-ADM 804 is re-issued periodically with new versions superseding the previous policy. (Doc. 99, at 4 & n.1). The version of DC-ADM 804 in place when Scott filed his first grievance was effective as of January 3, 2005. (Doc. 99, at 4 n.1). That version of DC-ADM 804 was superseded by a new version that took effect on December 8, 2010, and the DOC has subsequently revised the policy several more times. (Doc. 99, at 4 n.1).

appeal to final review before the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Doc. 99, at 5); DC-ADM 804 § VI.D (effective Jan. 3, 2005). A claim is properly exhausted upon SOIGA's completion of final review. *Garcia v. Kimmell*, 381 F. App'x 211, 213 n.1 (3d Cir. 2010) (not precedential) ("Proper exhaustion in Pennsylvania requires completion of a three-part procedure; initial review, appeal, and final review." (citing *Spruill*, 372 F.3d at 232)).

An inmate's procedural default for the failure to properly exhaust administrative remedies may be excused, however, if the prisoner can show that a particular remedy or procedural requirement was unavailable. *Small v. Camden Cnty.*, 728 F.3d 265, 273-74 (3d Cir. 2013); *Berry v. Klem*, 283 F. App'x 1, 4-5 (3d Cir. 2008) ("[W]e made clear . . . that the PLRA requires exhaustion of all available remedies, not all remedies."). "A grievance procedure is not available even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it." *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003). Likewise, where an inmate "fail[s] to receive even a response to the grievances addressing . . . incidents, much less a decision as to those grievances, the appeals process [i]s unavailable to him."[3] *Small*, 728 F.3d at 273.

---

[3] In one of its most recent opinions, the United States Court of Appeals for the Third Circuit reiterated that a prison "render[s] its administrative remedies unavailable to [an inmate] when it fail[s] to timely (by its own procedural rules) respond to his grievance and then repeatedly ignore[s] his follow-up requests for a decision on his claim." *Robinson v. Superintendent Rockview SCI*, No. 14-2994, 2016 WL 4010438, at *5 (3d Cir. July 27, 2016).

The failure to exhaust available administrative remedies is an affirmative defense, and as such it must be pleaded and proven by a defendant.[4] *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002). "Proof of the defense of failure to exhaust must be made by a preponderance of the evidence." *Cooper v. Martucchi*, No. CIV.A. 15-267, 2015 WL 4773450, at *1 (W.D. Pa. Aug. 12, 2015). The issues of whether or not an inmate has exhausted administrative remedies and whether a grievance procedure is available are both questions of law to be determined by the court, even if those determinations require the resolution of disputed facts. *Small*, 728 F.3d at 271 ("[T]he District Court did not err by acting as the fact finder because exhaustion constitutes a preliminary issue for which no right to a jury trial exists."). Where this process entails fact-finding and resolution of factual disputes, the Court may resolve the issue of exhaustion through an evidentiary hearing. *Small*, 728 F.3d at 268.

### B. Scott's Administrative Remedy History

Scott's administrative remedy history, as it pertains to the remaining claims in his amended complaint, centers on concerns that he was inhibited from practicing various tenants of his Orthodox "Sunniyy" Islamic faith, in large part because Erdogan practiced and catered to Wahhabism, a fundamentalist sect of Islam that Scott considers heretical. (Doc. 12, ¶¶ 1-4; Doc.

---

[4] As an affirmative defense, nonexhaustion of remedies may be waived if not raised in a timely manner. *See Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991) ("Failure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense."). Here, however, counsel for Scott does not contend that Erdogan waived his exhaustion defense by failing to assert it earlier in this litigation. Because Scott does not assert that he will suffer any prejudice and Erdogan raised the issue of exhaustion prior to trial, this Court is satisfied that the exhaustion defense has not been waived. *Cf. Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010) ("We decline to read a strict timing requirement into the PLRA for prosecution of the affirmative defense of failure to exhaust.").

94, ¶ 11). Scott points to four requests submitted between 2010 and 2012 as evidence that he exhausted all administrative remedies available to him. (Doc. 100, at 4-16). Scott contends, and Erdogan does not appear to dispute, that these four requests sufficiently pertain to and gave the DOC notice of the remaining claims in Scott's amended complaint. The Court considers each of Scott's requests in turn.

### 1. Religious Accommodation Request Pursuant to DC-ADM 819

Scott contends that he first attempted to address his perceived inability to practice his faith by filing an inmate religious accommodation request pursuant to DC-ADM 819 on or about February 8, 2010. (Doc. 94, at 3). Erdogan, on the other hand, asserts that SCI-Huntingdon staff never received Scott's religious accommodation request. (Doc. 99, at 15). At the evidentiary hearing, Scott testified that he submitted his religious accommodation request form in February of 2010, approximately six months before the start of Ramadan that year, by placing the form in the chaplain's box. (Doc. 98, at 29, 48-50; Doc. 100, at 5). Among the claims addressed in the form, Scott requested congregational prayer and complained that SCI-Huntingdon only offered "Sunniyy" Islamic services under the Wahhabi branch, which Scott considered unacceptable. (Doc. 98, at 49). After receiving no response to the religious accommodation request, Scott alleges that he followed up with written inquiries to Reverend Earlston on or about June 21, 2010 and to Deputy Superintendent Brian Corbin on or about August 18, 2010. (Doc. 98, at 50-51). These follow-up letters, which mentioned the February 8, 2010 religious accommodation request, also went unanswered. (Doc. 98, at 50-52).

To the extent that Scott submitted an inmate religious accommodation request in February of 2010, it would have been governed by DC-ADM 819-03, which was the version of DC-ADM 819 in effect from March 3, 2006 until February 1, 2013. DC-ADM 819-03 (effective

- 6 -

Mar. 3, 2006); DC-ADM 819 § VIII.A.1.d (effective Feb. 1, 2013) (listing DC-ADM 819-03 as the most recent superseded policy). Both parties referenced this policy at the evidentiary hearing and Erdogan introduced it as an exhibit, indicating that there is no dispute as to DC-ADM 819-03's applicability and key requirements. (Doc. 98, at 43-46).

The purpose of DC-ADM 819-03 "is to establish policy and procedure to accommodate inmates' religious beliefs while they are in the custody of the [DOC]." DC-ADM 819-03 § II (effective Mar. 3, 2006). DC-ADM 819-03 § VI.G lays out the procedure an inmate must follow to request a religious accommodation. DC-ADM 819-03 § VI.G (effective Mar. 3, 2006). To initiate an accommodation request, an inmate must complete a DC-52 Inmate Religious Accommodation Request Form and submit it to the Facility Chaplaincy Program Director ("FCPD"). DC-ADM 819-03 § VI.G.2.a (effective Mar. 3, 2006). Upon receipt of the DC-52 form, "[t]he Religious Accommodation Review Committee shall review each inmate's request for a religious accommodation within 45 days of receipt, and forward a recommendation to the affected Regional Deputy Secretary."[5] DC-ADM 819-03 § VI.G.2.d (effective Mar. 3, 2006). Next, the Regional Deputy Secretary must approve or disapprove of the inmate's request and notify the Director of the Bureau of Inmate Services of the decision within 15 days of receiving the Religious Accommodation Review Committee's recommendation. DC-ADM 819-03 § VI.G.2.e (effective Mar. 3, 2006). The Director of the Bureau of Inmate Services then has 10 days to inform the Facility Manager and the FCPD of the decision and provide copies of all final determinations. DC-ADM 819-03 § VI.G.2.f (effective Mar. 3, 2006). Within 10 working

---

[5] The Religious Accommodation Review Committee is composed of "various Religious Faith Group Leaders and Central Office staff (i.e., Security, Medical, Food Services, etc.) that reviews inmates' requests for religious accommodations." DC-ADM 819-03 § IV.K (effective Mar. 3, 2006).

days of receiving the decision, the FCPD must inform the inmate whether the request will be accommodated. DC-ADM 819-03 § VI.G.2.f (effective Mar. 3, 2006). If the request is not accommodated, the inmate may then file a grievance in accordance with DC-ADM 804. DC-ADM 819-03 § VI.G.2.g (effective Mar. 3, 2006). Thus, as DC-ADM 819-03 makes explicit, "[g]rievances may only be submitted *after* the inmate has received notification of the decision on the requested accommodation." DC-ADM 819-03 § VI.G.2.g (effective Mar. 3, 2006) (emphasis added).

Scott argues that his religious accommodation request allegedly submitted on February 8, 2010 complies with all requirements established in DC-ADM 819-03, as he submitted his request on the proper DC-52 form and attached documentation describing the beliefs and practices of his particular school of Islam. (Doc. 98, at 48-50); DC-ADM 819-03 § VI.G.2.a, c (effective Mar. 3, 2006). Other than his contention that Scott's religious accommodation request was not properly submitted, Erdogan does not argue that the copy of the DC-52 form produced by Scott at the evidentiary hearing failed to comply with any other requirements established in DC-ADM 819-03.

The Court finds, by a preponderance of the evidence, that Scott properly submitted a religious accommodation request on or about February 8, 2010, in conformity with DC-ADM 819-03. In reaching this conclusion, the Court finds persuasive Scott's own testimony as to his religious accommodation request submission and his follow-up letters to Reverend Earlston and Deputy Superintendent Brian Corbin, as well as the copies of the religious accommodation request form and letters to Earlston and Corbin submitted at the evidentiary hearing. Erdogan, on the other hand, relies on the lack of any record indicating that Scott's February 8, 2010 religious accommodation request was properly submitted. (Doc. 99, at 15). Erdogan's position

is undermined, however, by the testimony of Reverend Ulrich Klemm, a member of the Religious Accommodation Review Committee, who admitted at the evidentiary hearing that DOC policy did not require chaplains to log or otherwise record submitted inmate religious accommodation requests at the time Scott alleges he submitted his DC-52 form. (Doc. 98, at 45). Indeed, the DOC only added an optional tracking form in 2013 when it promulgated a new version of DC-ADM 819. (Doc. 98, at 46). The Court therefore deems the absence of any record indicating receipt of Scott's DC-52 submission to be of minimal probative value, and thus is outweighed by Scott's own testimony and evidentiary submissions.

### 2. Grievance Submissions Pursuant to DC-ADM 804

In addition to his religious accommodation request, Scott argues that he submitted three grievance requests pursuant to DC-ADM 804 between July of 2010 and January of 2012 that are pertinent to the current exhaustion inquiry. (Doc. 100, at 6-16). The parties do not dispute the contents or submission dates of any of Scott's grievances.

In the first grievance, No. 326166, submitted on July 13, 2010, Scott bemoans the restriction of certain "Sunniyy" Islamic religious practices and bemoans that only Wahhabist teachings are offered. (Doc. 98, at 53). Scott also makes note that he previously contacted Reverend Earlston on June 21, 2010 in reference to these issues, but filed grievance No. 326166 after fifteen days elapsed without a response. (Doc. 98, at 53). On July 15, 2010, Scott's grievance was rejected on the grounds that he failed to submit the grievance within fifteen working days of the events upon which his claims were based. (Doc. 98, at 54). The facility grievance coordinator further noted that Scott may resubmit his grievance if he could provide specific dates of when he was denied Islamic items and services. (Doc. 100, at 7). Scott failed to resubmit grievance No. 326166. (Doc. 100, at 7).

Scott's second grievance, No. 333052, was submitted on August 30, 2010 during Ramadan of that year. (Doc. 98, at 54). In it, he complains of restrictions on his religious practices, particularly in regard to the evening Ramadan meal, and again argues that the Wahhabi services offered are incompatible with his own "Sunniyy" beliefs. (Doc. 100, at 7-8). Scott also stated in grievance No. 333052 that he contacted Earlston on June 21, 2010 and Corbin on August 18, 2010 to make these same requests, and that incidents he complains of are ongoing. (Doc. 100, at 7-8). On September 1, 2010, grievance No. 333052 was also rejected on timeliness grounds, and Scott was again permitted to resubmit if he could provide information to establish timeliness. (Doc. 100, at 7-8). Scott resubmitted grievance No. 333052 the following day and attached a cover letter explaining that his claims were ongoing because he was currently fasting for Ramadan and the other issues mentioned in his grievance recur each Friday when he cannot attend Jumuah prayer services due to the fact that the services offered are incompatible with his faith. (Doc. 98, at 55). Nevertheless, Scott's resubmitted grievance No. 333052 was also rejected by the facility grievance coordinator as untimely on September 9, 2010. (Doc. 98, at 55). Scott did not appeal the second rejection of grievance No. 333052. (Doc. 98, at 55-56).

On January 26, 2012, Scott submitted grievance No. 398817, his third and final grievance that pertained to the issues remaining in this action. (Doc. 98, at 57-58). Grievance No. 398817 again raised issues pertaining to the Friday Jumuah prayer services, the Ramadan meal, and the exclusive availability of Wahhabi services. (Doc. 100, at 10). As with Scott's previous grievances, the facility grievance coordinator rejected No. 398817 on timeliness grounds on January 30, 2012, while permitting him to resubmit if he could provide information to establish timeliness. (Doc. 98, at 58). Scott responded by writing a letter to the

Superintendent of SCI-Huntingdon on February 10, 2012, in which he alleges that the issues he complains of are ongoing in nature, and asserts that the facility grievance coordinator's rejection of Scott's grievances has prevented him from being able to complete the DOC's exhaustion requirement. (Doc. 98, at 58). Scott received a response from the facility grievance coordinator on February 14, 2012, asking whether Scott sought to resubmit his grievance or appeal its rejection. (Doc. 98, at 58). Scott then appealed the rejection of grievance No. 398817 to the facility manager, who upheld the facility grievance coordinator's response on February 29, 2012, noting that "[t]he [I]slamic prayer services and classes offered at SCI-Huntingdon have been in place for a number of years and the content has remained consistent throughout the years." (Doc. 98, at 59). On March 2, 2012, Scott appealed the facility manager's decision to SOIGA, which rendered a final appeal decision on April 18, 2012 dismissing the appeal for failing to provide required documentation.[6] (Doc. 100, at 10).

Scott asserts that he was unaware of the ability to appeal a rejected grievance until he received the facility grievance coordinator's note on February 14, 2012 asking whether he sought to resubmit or appeal grievance No. 398817. (Doc. 98, at 58-59). Thus, Scott did not appeal the rejections of his earlier grievances, Nos. 326166 and 333052, because he thought they were not appealable. (Doc. 98, at 55-57). Counsel for Scott sheds further light on this assertion, indicating that Scott's belief that rejected grievance Nos. 326166 and 333052 were not appealable was supported by the plain language of the DC-ADM 804 policy in effect at that

---

[6] Scott argues that he could not provide all required documentation because the initial grievance request was not returned to him by the facility manager and Scott did not have an opportunity to print off another copy due to the time constraints he faced in submitting his final appeal to SOIGA. (Doc. 98, at 60-61). Nonetheless, Scott admitted on cross examination that he did not attempt to explain to SOIGA why he was missing certain required documentation. (Doc. 98, at 63).

time. (Doc. 100, at 9). Specifically, the policy stated that "[t]he Initial Review decision from the Grievance Officer must be received by the inmate before any appeal to the Facility Manager can be sought." DC-ADM 804 § VI.C.1.a (effective Jan. 3, 2005). DC-ADM 804's "Initial Review" procedures in effect at that time provided, in relevant part:

> 5. If the Facility Grievance Coordinator determines that the issue being grieved is in accordance with DC-ADM 804, the Facility Grievance Coordinator designates a staff member to serve as the Grievance Officer for that issue. . . .
>
> 6. If the Facility Grievance Coordinator determines that the issue being grieved is not in accordance with **DC-ADM 804**, it shall be returned to the inmate unprocessed with a **DC-804, Part 3, Grievance Rejection Form (Attachment C)** enumerating the reason(s) the grievance was not accepted. . . .
>
> 7. *When* the Grievance Officer submits the grievance for formal resolution, he/she shall provide a written response to the inmate within 10 working days of receipt of the grievance. The Grievance Officer's response shall be *typed* using a **DC-804, Part 2, Initial Review Response (Attachment B)**. The response shall include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issue(s) raised in the grievance. One of the following dispositions must be included in the initial response: Uphold Inmate, Grievance Denied, or Grievance Resolved.

DC-ADM 804 § VI.B.5-7 (effective Jan. 3, 2005).

Counsel for Scott argues that because grievance nos. 326166 and 333052 were rejected as untimely and returned unprocessed, Scott's grievances were never assigned to a staff member and thus Scott never received an Initial Review Response with respect to those grievances. (Doc. 100, at 9). Accordingly, Scott alleges that he did not have the ability to appeal those rejections because the receipt of an Initial Review decision from the Grievance Officer was a prerequisite to filing an appeal. (Doc. 100, at 9). On December 8, 2010, a new version of DC-ADM 804 took effect, which stated that "[a]n inmate may appeal an Initial Review Response/Rejection . . . ." (Doc. 100, at 9-10 (citing DC-ADM 804 § 2.A.1.a (effective Dec. 8, 2010))). The new version of DC-ADM 804 was in effect when Scott filed grievance No. 398817

on January 26, 2012, but Scott argues that the change in policy language demonstrates that he did not have the ability to appeal his earlier rejected grievances that were submitted before the policy change took place. (Doc. 100, at 9-10).

Counsel for Erdogan, on the other hand, relies on the evidentiary hearing testimony of Connie Green, SCI-Huntingdon's grievance coordinator, who stated that inmates had the right to appeal rejected grievances both before and after the December 8, 2010 revisions to DC-ADM 804. (Doc. 98, at 10, 12). More specifically, Green testified that the DOC considered a grievance rejection to be a form of initial review decision under the DC-ADM 804 policy that was in effect from January 3, 2005 until December 8, 2010. (Doc. 98, at 25-26). Green's interpretation of this version of DC-ADM 804 appears to be widespread, as the United States Court of Appeals for the Third Circuit and its district courts frequently dismissed inmate civil rights complaints on nonexhaustion grounds because the inmate failed to appeal a grievance that was rejected prior to the December 8, 2010 revisions. *See, e.g., Reyes v. Sobina*, 333 F. App'x 661, 663 (3d Cir. 2009) (not precedential) (finding that prisoner-plaintiff failed to exhaust after not appealing a grievance that was rejected as untimely); *Payne v. Pitkins*, No. 3:10-CV-128, 2011 WL 2462493, at *2 (W.D. Pa. May 27, 2011) (same), *report and recommendation adopted*, No. 3:10-CV-128, 2011 WL 2446293 (W.D. Pa. June 17, 2011); *Jones v. Vaughn*, No. CIV.A.04-1912, 2005 WL 1971869, at *6 (E.D. Pa. Aug. 16, 2005) (same). Nonetheless, this Court is unable to find any case that specifically contemplates Scott's assertion that the plain language of the version of DC-ADM 804 in effect at the time did not permit inmates to appeal a rejected grievance because a rejection was not an "Initial Review decision from the Grievance Officer...." DC-ADM 804 § VI.C.1.a (effective Jan. 3, 2005). Scott's argument is not without merit; even if—as Green contends—a grievance rejection was always considered by the DOC to

be a type of initial review decision, grievance rejections were provided by the grievance coordinator rather than the grievance officer and thus do not satisfy DC-ADM 804 § VI.C.1.a's prerequisites to filing an appeal. *See* DC-ADM 804 § VI.C.1.a (effective Jan. 3, 2005) ("The Initial Review decision from the Grievance Officer must be received by the inmate before any appeal to the Facility Manager can be sought."). *See generally* DC-ADM 804 § IV.K (effective Jan. 3, 2005) (defining "Grievance Officer" as "[a]n appropriate Department Head or management level staff person designated by the Facility Grievance Coordinator"). Furthermore, counsel for Erdogan has presented no evidence to suggest that Scott was informed that the DOC would treat grievance rejections as appealable initial review decisions until after the policy was changed in December of 2010. *See Santiago v. Fields*, 170 F. Supp. 2d 453, 458 (D. Del. 2001) ("Although plaintiff allegedly failed to appeal the rejection of his grievance form, the court finds that defendants have presented insufficient evidence to suggest that plaintiff was adequately notified of the rejection and his obligation to appeal it so as to preserve his right to sue."). Accordingly, although Scott has not strictly complied with the exhaustion requirements in place, the Court finds that his second grievance filing, No. 333052, was in substantial compliance with the version of DC-ADM 804 in effect at the time. *See Caldwell v. Folino*, No. 2:08-CV-00122, 2011 WL 4899964, at *7 (W.D. Pa. Oct. 14, 2011) ("Under these circumstances, the Court is reluctant to find that Plaintiff has failed to exhaust the administrative remedies available to him. . . . Plaintiff appears to have been justifiably confused by the absence of guidance in the regulations . . . .").

### C. SCOTT EXHAUSTED THE ONLY ADMINISTRATIVE REMEDIES AVAILABLE

Having concluded that Scott properly submitted a religious accommodation request on or about February 8, 2010, the Court next must determine the impact of the DOC's failure to

process and reach a decision on the requested accommodation in accordance with DC-ADM 819-03. Scott urges this Court to find that the DOC's inaction rendered any further administrative remedies—namely, the inmate grievance process established in DC-ADM 804—unavailable to him. (Doc. 100, at 6). "The PRLA does not require exhaustion of all remedies. Rather, it requires exhaustion of such administrative remedies 'as are available.'" *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002). As noted above, DC-ADM 819-03 provides that "[g]rievances may only be submitted after the inmate has received notification of the decision on the requested accommodation." DC-ADM 819-03 § VI.G.2.g (effective Mar. 3, 2006). This Court finds the plain language of DC-ADM 819-03 § VI.G.2.g to be clear. Accordingly, because Scott never received notification of a decision on his February 8, 2010 accommodation request, he never had a right to pursue a grievance. (Doc. 100, at 6); *see also Small*, 728 F.3d at 273 (holding that a prison's failure to respond to inmate's grievance renders administrative remedy process unavailable to that inmate); *Brown*, 312 F.3d at 113 ("Assuming security officials told Brown to wait for the termination of the investigation before commencing a formal claim, and assuming the defendants never informed Brown that the investigation was completed, the formal grievance proceeding required by DC–ADM 804 was never 'available' to Brown within the meaning of 42 U.S.C. § 1997e.").

At the evidentiary hearing and oral argument, counsel for Erdogan argued that Scott had additional administrative remedies available because he still managed to file several grievance requests pursuant to DC-ADM 804 between July of 2010 and January of 2012. (Doc. 98, at 69). This argument is unavailing. To the extent that Scott attempted, albeit imperfectly, to comply with the DC-ADM 804 procedure, he did all he was required to in light of the DOC's failure to respond to Scott's religious accommodation request. *See Small*, 728 F.3d at 273 & n.9

- 15 -

("That [plaintiff] *could* appeal a non-decision . . . says nothing about whether he was *required* to do so by virtue of a [prison's] procedural requirement to appeal a non-decision."); *see also Cooper v. Beard*, No. 3:CV 07 0620, 2007 WL 1959300, at *5 (M.D. Pa. July 2, 2007) (excusing inmate's failure to strictly comply with exhaustion requirements where defendants failed to comply with DC-ADM 819's procedures regarding inmate's religious accommodation request and inmate substantially exhausted his claims). Indeed, Scott filed three separate grievances relating to his ability to practice his religion that were each rejected on the grounds that he failed to submit the grievance within fifteen working days of the events upon which his claims were based. (Doc. 99, at 6-13). However, because the events Scott complained of were ongoing and related to the practice of his religion, the only possible "trigger" that could commence DC-ADM 804's fifteen-day window would have been the denial of his accommodation request. (Doc. 98, at 53, 66). Accordingly, Erdogan's affirmative defense of nonexhaustion will be denied.

### D. STATUS OF SECRETARY WETZEL

As a final matter, the parties contest whether Defendant DOC Secretary Wetzel remains a party to this case in his official capacity solely in regard to Scott's RLUIPA claims. Scott argues in the brief in opposition to the bifurcation motion that Wetzel is the proper Defendant to Scott's RLUIPA claim because Erdogan is not an officer of the DOC. (Doc. 88, at 4-5). Scott contends that Erdogan lacks the authority to bring about the injunctive relief sought in the RLUIPA claim involving Ramadan, whereas Wetzel could comply with an order granting injunctive relief across the DOC system. (Doc. 88, at 5-7). Specifically, Scott appears concerned that this claim would be rendered moot if he is transferred to another DOC facility. (Doc. 88, at 5-7). The DOC Defendants, on the other hand, urges this Court to adopt the plain language of

the District Court's March 25, 2015 Memorandum and Order granting in part and denying in part the DOC Defendants' motion for summary judgment, in which the District Court found that "[w]ithout unnecessary elaboration, summary judgment is warranted in favor of Defendant, Wetzel, on all claims."[7] (Doc. 89, at 3 (citing Doc. 59, at 14)). Additionally, the DOC Defendants argue that the time for Scott to contest or seek clarification of the District Court's March 25, 2015 Order has long passed. (Doc. 89, at 3-4).

This Court agrees with the DOC Defendants that the clear language of the District Court's March 25, 2015 Memorandum and Order mandates dismissal of all claims against Wetzel in both his individual and personal capacities. "The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation. The doctrine applies 'as much to the decisions of a coordinate court in the same case as to a court's own decisions.'" *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). The Third Circuit recognizes three exceptions where reconsideration of a prior decision is warranted: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Pub. Interest Research Grp. of N.J., Inc.*, 123 F.3d at 117. Scott does not contend, nor does it appear on the face of the parties' filings, that any of these three possible exceptions could apply here. Furthermore, to the extent that Scott believes that the plain language of the March 25, 2015 Order "enter[ing] judgment in favor of Wetzel and against Plaintiff on all claims" did not reflect the District

---

[7] Scott characterizes the District Court's March 25, 2015 Order as "perhaps overly terse" and also points out that Wetzel remains listed on the docket as a Defendant in this action. (Doc. 88, at 3, 5).

Court's true intent, he should have raised this argument in a timely motion for reconsideration. (Doc. 60). Instead, counsel for Scott impermissibly attempts to make this argument for the first time in a brief in opposition to Erdogan's bifurcation motion, nearly eight months after the District Court's Order was entered and over three months after counsel for Scott first entered her appearance in this case. (Doc. 60; Doc. 70; Doc. 88). Accordingly, Scott's contention that Wetzel should remain as a Defendant to the RLUIPA claim in his official capacity is both untimely and procedurally improper.[8]

An appropriate Order follows.

BY THE COURT:

Dated: August 4, 2016

*s/ Karoline Mehalchick*
KAROLINE MEHALCHICK
United States Magistrate Judge

---

[8] The Court also is unconvinced by Scott's counsel's assertion that "Erdogan cannot be a defendant for the RLUIPA claims in this action." (Doc. 88, at 4-5). The proper defendant to an RLUIPA claim is a "government." *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005) (citing 42 U.S.C. § 2000cc-1(a)). "For the purposes of RLUIPA, 'government' includes any official of a 'State, county, municipality, or other governmental entity created under the authority of a State,' as well as any other person 'acting under color of State law.'" *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007) (quoting 42 U.S.C. § 2000cc–5(4)(A)). As counsel for Scott maintains that Erdogan was "a state employee and acting under color of state law," her assertion that Erdogan is not a proper defendant to a RLUIPA claim appears to be misplaced. (Doc. 88, at 4-5); *see also Pineda-Morales v. De Rosa*, No. CIV. 03-4297(JBS), 2005 WL 1607276, at *14 (D.N.J. July 6, 2005) (holding that prison chaplains act under color of state law and therefore denying summary judgment under the Religious Freedom Restoration Act, RLUIPA's predecessor statute). Lastly, counsel for Scott's concern that a potential transfer would render moot any injunctive relief ordered by this Court is simply too speculative for the Court to consider at this stage.